**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                               **Criminal Case No.: 1:24-CR-2
                                          (JUDGE KLEEH)**

**JO-EL TORRES,**

        **Defendant.**

## REPORT AND RECOMMENDATION, RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 31] BE DENIED

Pending before the undersigned Magistrate Judge is a motion to suppress [ECF No. 31] filed by Defendant Jo-El Torres ("Defendant") on April 4, 2024. By Referral Order dated April 5, 2024 [ECF No. 32], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The Court also is in receipt of the Government's response in opposition [ECF No. 38] to Defendant's motion, filed on April 11, 2024. [ECF No. 38]. The undersigned conducted a hearing on Defendant's motion on May 16, 2024, at which the Court heard witness testimony and accepted exhibits into evidence. At the hearing, Defendant's counsel requested the opportunity to submit additional briefing on the matter, and timely filed a supplement [ECF No. 57] to the motion on June 7, 2024. The Government filed a response [ECF No. 60] to the supplement on June 14, 2024.

Based on a detailed review of Defendant's motion [ECF No. 31]; the Government's response [ECF No. 38]; the exhibits introduced into evidence at the hearing on Defendant's motion; the testimony given by witnesses at said hearing; Defendant's supplement [ECF No. 57]

to the motion; and the Government's response [ECF No. 60] to the supplement, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant stands accused in a two-count indictment which a Grand Jury returned against him on January 3, 2024. [ECF No. 1].  Defendant is named in the Indictment with the offenses of (1) Possession with Intent to Distribute Fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and (2) Possession with Intent to Distribute Alprazolam, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(2).

As a result of a law enforcement initiative to target drug trafficking, on May 30, 2023, an officer observed a vehicle, a black Ford Fusion ("the Fusion"), as part of a suspected hand-to-hand drug transaction in a parking lot. Officers had learned about the suspected drug transaction in advance, based on information provided by a confidential informant ("CI"). After the officer observed the suspected hand-to-hand transaction and relayed that information to a second officer who was positioned nearby, that second officer followed the Fusion in traffic and observed a purported traffic violation when the Fusion crossed left of center. The second officer eventually initiated a traffic stop of the Fusion, in which Defendant was a passenger. Other officers arrived at the scene of the stop, during which Defendant handed one of the officers a plate of marijuana. Officers conducted a free air K-9 sniff of the Fusion, and the K-9 indicated on the Fusion. When Defendant was removed from the Fusion to be searched, he attempted to flee, and in so doing, attempted to swallow fentanyl which was hidden in his pants.

Defendant challenges the reliability of the CI's tip, and law enforcement's conclusion that a hand-to-hand transaction took place in the parking lot. Thus, Defendant argues, there was no reasonable suspicion that a drug crime occurred. Defendant also challenges the propriety of the

traffic stop, arguing that there was no left-of-center traffic violation. As such, Defendant argues, the traffic stop – be it for the suspected hand-to-hand drug transaction or for the traffic violation – was improper, and evidence recovered from the traffic stop should be suppressed.

For its part, the Government argues that law enforcement articulated more than enough facts to support the conclusion that there was a hand-to-hand drug transaction, especially given that the CI's information was corroborated. As for the traffic stop, the Government argues that there was a "plausible" justification for the stop, such that it was proper. And finally, per the Government, even if the traffic stop was improper, the attenuation doctrine applies here to allow the evidence in question. As to attenuation, the Government argues, Defendant committed three intervening acts during the traffic stop to justify officers' seizure of the evidence at issue: voluntarily displayed marijuana on a plate, attempted to flee from the scene, and attempted to swallow fentanyl.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on May 16, 2024, the Court heard sworn testimony from five witnesses, namely, (1) Officer Aaron Lantz ("Lantz"), of the Bridgeport, West Virginia Police Department, who is a member of the Mountaineer Highway Interdiction Team ("MHIT"), which is an initiative of the Greater Harrison County Drug and Violent Crimes Task Force ("Task Force"); (2) Sgt. Martin Bailey ("Bailey") of the West Virginia State Police; (3) Patrolman Kane Bender ("Bender") of the Clarksburg, West Virginia Police Department; (4) Investigator Russell Semplice ("Semplice") with the Federal Public Defender; and (5) Det. Cameron Golden ("Golden") of the Bridgeport, West Virginia Police Department. The Court also received into evidence the following (in this order):

3

1. Government's Exhibit 3 [ECF No. 54], which is an excerpt from Lantz's dashcam video footage;

2. Government's Exhibit 2 [ECF No. 54], which is an excerpt from Lantz's bodycam video footage;

3. Government's Exhibit 4 [ECF No. 54-1], which is a photograph depicting the plate of marijuana which Defendant displayed during the traffic stop;

4. Defendant's Exhibit 1 [ECF No. 54-2], which is a Google Earth map of the general area where the traffic stop occurred;

5. Government's Exhibit 5 [ECF No. 54], which is an excerpt of Bender's bodycam video footage;

6. Government's Exhibit 6 [ECF No. 54-3], which is photograph depicting a segment of the public road (Philippi Pike) on which the Fusion traveled prior to the traffic stop;

7. Defendant's Exhibit 2 [ECF No. 54-4], which is a map depicting Semplice's measurements, at various points, of the width of the part of the road on which the Fusion traveled prior to the traffic stop; and

8. Defendant's Exhibit 3 [ECF No. 54], which is security video footage of the parking lot where law enforcement witnessed the suspected hand-to-hand drug transaction.

### A. Lantz's Testimony – Direct Examination

The Government called Lantz to testify. According to his testimony,[1] Lantz has been a member of the Bridgeport Police Department for the last nine years, and is assigned to the Task

---

[1] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on May 16, 2024, which is located on the section of the Court's intranet site for FTR recordings.

Force, where he has been assigned to MHIT for the last eight years. [1:34:20 1:34:38]. Lantz worked for another municipal police department for approximately two years prior to that, with a total of approximately 11 years of law enforcement experience. [1:34:40 to 1:34:50]. Lantz testified as to his training and experience with regard to detection of marijuana, and with traffic stops. [1:34:52 to 1:35:59]. During his police academy training, Lantz received a block of instruction for the detection of both raw and burned/smoked marijuana. Id. Lantz estimated that, in 2023, he made at least 500 traffic stops, and issued approximately 50 to 75 citations. Id. He also estimated that, in 2023, he smelled burned marijuana during traffic stops approximately 25 to 50 times. [1:36:12 to 1:37:30]. And he testified that, in 2023, he smelled fresh marijuana during traffic stops more often than burned marijuana. Id. Lantz estimated that he smelled fresh marijuana during traffic stops in 2023 approximately 50 to 100 times. Id. In explaining why detection of fresh marijuana is more common than detecting burned marijuana, he said that people more commonly choose not to smoke (burn) marijuana while driving, to avoid driving under the influence and receiving a citation for it. Id. Lantz also estimated that, in 2023, during his traffic stops, people voluntarily handed over marijuana approximately five to 10 times. Id. He explained that in so doing, people who are subject to the stops believe that they will be seen as compliant, in hopes of deterring a search of the vehicle. Id.

When Lantz smells marijuana during a traffic stop, he usually radios for another police unit to come to the scene to assist. [1:37:32 to 1:38:15]. In these scenarios, Lantz always removes the occupants from the vehicle and conducts a search. Id. He does so even if an occupant of a vehicle hands over marijuana voluntarily. Id.

Lantz described the Task Force's makeup of local, state, and federal agencies, and explained that its mission is to get drugs off the street. [1:39:06 to 1:39:24]. He explained that

MHIT is part of Task Force operations, [1:39:26 to 1:40:10]. MHIT is the uniformed division of the Task Force; other persons and units in the Task Force often work undercover, in plain clothes and unmarked vehicles. Id. As such, MHIT more often conducts traffic stops. Id. MHIT also works various drug interdiction efforts, and develops CIs for Task Force use. Id. One duty of the Task Force is drug surveillance. [1:40:12 to 1:40:41]. Such surveillance usually is done undercover, and can be of a residence, business, person, vehicle, or other subject of interest. Id.

Lantz described a hand-to-hand transaction as being the exchange of drugs for money. [1:40:43 to 1:41:28]. An officer observing a hand-to-hand transaction does not always see the drugs themselves. Id. Hallmarks of hand-to-hand transactions can be one person walking up to a parked vehicle, interacting with someone in the vehicle (or getting into the vehicle) for a short time, and then both parties leaving the area. Id.

Lantz then testified as to what typically happens when the Task Force witnesses a hand-to-hand transaction. [1:41:35 to 1:42:21]. A Task Force officer will relay their observations to MHIT officers who are in the vicinity but out of sight. Id. MHIT officers try to anticipate any possible route the persons/vehicles under observation will go. Id. After the hand-to-hand transaction is complete, the MHIT officers conduct a traffic stop (assuming a vehicle is involved). Id.

In 2023, Lantz participated in drug surveillance operations "very frequently." [1:42:54 to 1:43:44]. He estimated that he did so approximately two to three times per week. Id. Lantz testified that he did not always conduct traffic stops of vehicles which had been under surveillance, because the drivers of such vehicles did not always commit traffic violations. Id.

On May 30, 2023, Lantz testified, during the surveillance operation giving rise to the charges herein, he was the only MHIT officer available at the time of events involving Defendant. [1:44:21 to 1:44:35].  Lantz explained that Golden had received information about a drug deal that

was going to happen in a particular locale. [1:44:38 to 1:44:48]. Golden got this information from a CI. [1:44:52 to 1:45:03]. The CI had told Golden that a person on a bicycle was going to go to a particular area to meet another person. [1:45:05 to 1:45:18]. The CI indicated that the meetup was to occur at the intersection of Joyce Street and Route 20 in Clarksburg, West Virginia, near the location of a Hardees restaurant and a CVS pharmacy. [1:45:33 to 1:45:44].

Lantz testified that he is familiar with local Clarksburg mannerisms and ways of people talking. [1:45:47 to 1:46:22]. As such, when people speak about the area of Hardees, they also are speaking to the area of CVS, as the two businesses are located close together. Id. The area where Hardees and CVS are located is considered to be a "high crime" area. Id. Lantz testified that the area is a high crime area because it is located near an exit/entrance of U.S. Route 50[2], which makes coming and going to the area fairly easy. [1:46:25 to 1:46:56]. Moreover, the nature of the two businesses (restaurant and retail chain pharmacy) is such that patrons frequently arrive and depart, such that drug activity is camouflaged and less noticeable to other people in the area. Id.

With the information gleaned from the CI, which Golden had shared with Lantz, Lantz positioned his police vehicle at a nearby cemetery. [1:47:14 to 1:48:09]. As Lantz was the only MHIT officer available at the time, the cemetery was a location providing the best possibility of trailing a vehicle as it left the area of Hardees and CVS. Id. Eventually, Golden observed a vehicle in a parking lot in the area of Hardees of CVS, with multiple occupants. [1:48:41 to 1:48:50]. Lantz was familiar with the vehicle which Golden was observing. [1:48:52 to 1:49:23]. Golden also observed a person arrive at the parking lot on a bicycle. Id. The person on the bicycle interacted

---

[2] Although Lantz did not testify to it specifically, U.S. Route 50 is, by local standards, a busy highway. It is a four-lane, divided thoroughfare designed to accommodate higher flows of vehicular traffic, and the undersigned takes judicial notice of the same.

briefly with someone on the passenger side of the vehicle. Id. Then both parties left the scene. Id. Golden shared this information with Lantz as he observed it. Id.

The vehicle which Golden observed, and with which Lantz was familiar, was the Fusion. [1:49:25 to 1:49:32]. Lantz was familiar with the Fusion from prior drug investigations, and described two times when he had stopped it before, once resulting in recovery of drugs. [1:49:42 to 1:51:24]. Thus, the Fusion was associated with drug distribution activity. Id.

The Government published its Exhibit 3, an excerpt from Lantz's dashcam video footage from when Lantz followed, and then eventually conducted a traffic stop of, the Fusion. The dashcam footage begins with Lantz's vehicle positioned in the cemetery. [1:56:50 to 1:57:24]. At the outset of the footage, Lantz had gleaned information from Golden about the direction the Fusion was traveling. Id. Lantz proceeded in the same direction. Id.

Lantz testified that observation of the hand-to-hand transaction gave rise to reasonable suspicion to initiate a traffic stop of the Fusion. [2:01:23 to 2:01:40]. However, Lantz testified that he had another legitimate reason to conduct a traffic stop: once he began following the Fusion, he observed a traffic violation by its driver. [2:01:42 to 2:02:15]. He testified that the traffic infraction was a violation of W. Va. Code § 17C-3-4, for failure to obey traffic control devices. Id. The specific violation was that the Fusion traveled to the left of double yellow lines in the center of the road. Id.[3]

Lantz explained that the double yellow lines are faint in the section of road where he observed the violation. [2:02:35 to 2:02:58]. This is because the violation occurred at a sharp curve in the road, and drivers commonly operate vehicles on the double yellow lines in navigating the curve, resulting in wear of the lines. Id. Lantz stated that he tries to avoid operating a vehicle in

---

[3] This purported traffic violation can be viewed in the dashcam footage beginning at approximately the 2:55 timestamp, through the 3:02 timestamp.

the opposite lane, because people so commonly operate vehicles crossing the double yellow lines as he observed the Fusion doing. [2:03:04 to 2:03:17]. Lantz described it as a dangerous segment of road – the direction the Fusion was traveling is downhill, the curve is steep, and the curve is difficult to see beyond. [2:03:19 to 2:03:29]. When traveling the direction opposite of what the Fusion was traveling, it can be difficult to see oncoming traffic. [2:03:34 to 2:03:48]. Thus, there is a risk of a head-on collision if a vehicle crosses the double yellow line. Id.

Lantz initiated a traffic stop of the Fusion. When Lantz first approached the Fusion, he recognized one person in the vehicle: the driver, David Cottrill ("Cottrill"). [2:08:41 to 2:08:55]. Lantz knew Cottrill to be the owner of the Fusion. Id. Defendant was in the passenger seat, but at the time, Lantz did not know him.  [2:09:00 to 2:09:05]. A third and final person was in the Fusion, a female in the back seat. [2:09:07 to 2:09:37]. Lantz did not recognize her at first, but later, during the traffic stop, he recognized her from prior drug trafficking investigations. Id.

When Lantz first approached the Fusion during the stop, he smelled fresh (un-burned) marijuana emanating from the vehicle. [2:09:55 to 2:10:11].

Lantz testified that he was wearing a body camera at the time of the traffic stop, and captured footage from it. [2:05:50 to 2:06:02]. Lantz's testimony at this point can be categorized in three parts: (1) the time during the stop before backup arrived, (2) the time during the stop once backup was there, and (3) the time during the stop when Defendant attempted to flee.

The Government published an excerpt from its Exhibit 2 (Lantz's bodycam footage). Early in the interaction with the Fusion's occupants, Lantz indicates to Cottrill that the Fusion went left of center around a turn, for which Cottrill apologizes. [2:12:02 to 2:02:35].[4] Lantz then runs the Fusion's tags and Cottrill's name with dispatch to determine if there are any outstanding warrants

---

[4] This is at approximately the 0:41 to the 0:47 timestamps of Government's Exhibit 2, Lantz's bodycam footage.

or other issues. [2:16:02 to 2:16:19]. During this part of the stop, Lantz returns to the Fusion to obtain Cottrill's updated address, as Cottrill had told Lantz earlier in the stop that the address on his license and registration was outdated. [2:16:57 to 2:17:14]. When Lantz returns to his police vehicle with the updated information, he can be heard on the bodycam footage saying to himself, "I smell a little bit of weed." [2:19:06 to 2:19:10].[5] In the footage, Lantz continues to wait in his police vehicle for the warrant and license check from dispatch, while he fills out a warning. [2:19:38 to 2:19:45].

In Lantz's bodycam footage, Bender is the first additional officer to arrive on the scene of the traffic stop. [2:19:48 to 2:20:00].[6] In the footage, Lantz continues to wait on further information from dispatch; he testified that the Fusion was not free to go until he gets clearance from dispatch. [2:20:31 to 2:20:41]. Lantz testified that Bailey arrived shortly after Bender. [2:21:58 to 2:22:04]. Per Lantz's testimony during the publication of the footage, an officer whom Lantz identified as Sgt. Harris ("Harris") also arrived. [2:22:10 to 2:22:15]. In the footage, dispatch eventually informs Lantz that Cottrill had a valid operator's license and no outstanding arrest warrants. [2:23:07 to 2:23:11].[7]

Lantz testified that Bender and Bailey did not extend the time Lantz needed to write up the warning, because they arrived on the scene before Lantz received necessary information from dispatch to complete the warning. [2:23:21 to 2:23:35]. When Bender arrived on the scene, he talked with Lantz and then had his K-9 partner, Asta, conduct a free air sniff of the Fusion's exterior. [2:23:41 to 2:24:27]. When Bailey arrived, he talked to the Fusion's occupants, and Defendant handed to Bailey a plate of marijuana. Id. Bailey placed the plate on the hood of the

---

[5] This is at the 4:36 timestamp of Government's Exhibit 2.
[6] This is at the 5:38 timestamp of Government's Exhibit 2.
[7] This is from the 6:45 to the 6:58 timestamps of Government's Exhibit 2.

Fusion and then looked back at Lantz. Id.  Lantz testified as to Government's Exhibit 4, which is a photograph of the plate of marijuana which Defendant handed to Bailey. [2:25:10 to 2:25:34].

Lantz testified as to the K-9 sniff of the Fusion. [2:25:53 to 2:29:03]. The K-9 indicated on the Fusion, and officers at the scene had the occupants exit the Fusion. Id. Officers conducted patdowns of the occupants. Id. Lantz handled the exit and patdown of Cottrill. Id. Harris handled the exit of Defendant. Id. Harris discovered a Crown Royal bag tied to Defendant's pants. Id. Defendant then attempted to flee the scene on foot. Id. Defendant fled approximately 20 to 30 feet, and then Bender and Harris stopped him; Lantz then assisted moments later. Id. Defendant was on the ground and resisting multiple commands from the officers. Id. Defendant reached down his pants. Id. Concerned that Defendant may be reaching for a weapon, Lantz also reached down Defendant's pants. Id. Defendant then attempted to swallow the contents of the Crown Royal bag. Id. Lantz reached into Defendant's mouth to prevent Defendant from swallowing the contents. Id. Ultimately, officers determined that the Crown Royal bag contained two bags of fentanyl, one bag of cocaine, and a quantity of Alprazolam pills. Id.

The Government then published another excerpt from its Exhibit 3, the dashcam footage.[8] [2:30:15 to 2:31:30]. This portion of the footage depicts Bender running the K-9 around the exterior of the Fusion.

### B. Lantz's Testimony – Cross-Examination

On cross-examination, Lantz stated that he did not himself observe events at the parking lot in the area of Hardees and CVS. [2:34:42 to 2:35:10]. He could not see the Fusion parked in the lot or the person who approached the Fusion. Id. Instead, Golden was the officer observing the scene. Id. Lantz was in contact with Golden the entire time that Lantz was positioned in his police

---

[8] This except begins at the 10:46 timestamp of Government's Exhibit 3.

vehicle in the nearby cemetery and Golden was observing the scene at Hardees and CVS. [2:36:25 to 2:37:00]. Golden relayed updates to Lantz. Id.

Golden told Lantz that the female on the bicycle approached the passenger side of the Fusion, had a brief interaction, and then both the female and the Fusion left. [2:42:11 to 2:42:36]. Golden followed the female on the bicycle and stopped her. Id. Golden also told Lantz about the Fusion leaving the area and the direction in which it was traveling. Id. As for what exactly happened between the female on the bicycle and the occupant(s) of the Fusion, Golden told Lantz that he observed an interaction which was consistent with a hand-to-hand drug transaction. [2:42:40 to 2:44:12].

Lantz testified about his conclusion that the area of Hardees and CVS is a "high-crime" area. [2:47:10 to 2:50:31]. Lantz testified that he determined it to be "high crime" because of his anecdotal experience, having conducted a number of drug investigations in the vicinity. Id. He also relied on the nature of the infrastructure and development there which allows for a higher volume of traffic, making the area more conducive to drug transactions. Id.

As for initiating the traffic stop, Lantz testified that he did not need to observe a traffic violation to pull over the Fusion. [2:52:13 to 2:54:49]. Lantz believed that the observation of the suspected hand-to-hand drug transaction provided reasonable suspicion to conduct a traffic stop. Id. Lantz determined that reasonable suspicion existed on the basis of (1) Golden's observation of the suspected hand-to-hand transaction at Fusion in the parking lot, and (2) Golden's receipt of information from the CI prior to the transaction about what would transpire. Id. Lantz did not know the identity of the CI, how much (if any) Golden had interacted with the CI in the past, how the CI was developed for communicating with the Task Force, or whether the CI was reliable. Id.

Lantz then testified about the traffic violation. [2:56:24 to 2:58:09]. The significance of the traffic violation was public safety; Lantz's concern was that the driver of the Fusion may have been distracted or possibly under the influence of a substance. Id. Lantz in particular was concerned about a violation of W. Va. Code § 17C-3-4, for failure to obey traffic control devices (with yellow lane lines constituting such "traffic control devices"). Id. Lantz acknowledged that W. Va. Code § 17C-3-4 does not reference yellow lines, but pointed to the "Definitions" section of the statute, W. Va. Code § 17C-1-47, to conclude that yellow lines on a roadway are to be treated as traffic control devices. Id. Further, Lantz acknowledged that, in the segment of the road where he perceived the traffic violation, the double yellow lines are faint; he did not concede that the double yellow lines are nonexistent there. [2:58:43 to 3:00:10]. Lantz stated that the dashcam video footage does not depict the traffic violation as clearly as he viewed the violation when he did so in real time. Id.

Defendant's counsel inquired of Lantz why he did not rely on W. Va. Code § 17C-7-1 for the traffic stop, which more directly requires the operation of motor vehicles on the right side of a roadway. [3:00:55 to 3:02:18]. Lantz replied that he ultimately did not issue a traffic citation or warning here. Id.

As for what he observed with the traffic violation, Lantz testified that he observed the Fusion being driven on top of the double yellow lines. [3:03:04 to 3:05:52]. The Fusion did not necessarily cross entirely over the double yellow lines. Id. To Lantz, crossing onto the yellow line on the right side of the flow of traffic is sufficient to constitute a violation. Id. He explained that each yellow line demarcates the center boundary for the lane of travel on the respective sides of the road, and a vehicle need not cross both lines to commit a traffic violation. Id.

### C. Bailey's Testimony (Direct and Cross Examination)

The Government called Bailey to testify. Bailey testified as to his arrival at the scene of the traffic stop of the Fusion, stating that he arrived just behind Bender. [3:18:30 to 3:18:44]. He parked his police vehicle behind Bender's vehicle, which was parked behind Lantz's. Id. When Bailey arrived at the scene, he spoke with Lantz and Bender. [3:18:46 to 3:19:17].  Lantz explained about the hand-to-hand transaction which earlier had led to the Task Force's interest in the Fusion. Id. Bender asked Bailey to watch the occupants of the Fusion while Bender retrieved his K-9 partner. Id.

When Bailey walked to the Fusion, he asked the occupants if they had anything illegal in the vehicle to disclose before the K-9 sniffed it. [3:19:38 to 3:20:21]. The occupants did not respond to the question. Id. A few moments later, Defendant handed Bailey a plate of marijuana. Id. At this point in Bailey's testimony, the Government published its Exhibit 4, depicting the plate of marijuana. [3:20:22 to3:20:54]. Bailey confirmed that it was the plate which Defendant handed to him. Id. The Government then published an excerpt from its Exhibit 3 (Lantz's dashcam footage) for Bailey to view. [3:21:05 to 3:22:12].[9] Bailey did not recall Defendant saying anything to him as Defendant handed over the plate of marijuana. Id. Bailey signaled to Lantz when he was handed the plate. Id. Bailey stated that he had a body camera at the time but did not capture footage of this interaction. Id. Bailey also stated that he did not smell marijuana while positioned next to the Fusion until Defendant handed him the plate. Id.

Bailey testified that Bender then returned to the Fusion with the K-9. [3:22:21 to 3:22:36]. The K-9 alerted on the front driver and front passenger doors. Id.

---

[9] Bailey approaches the Fusion at approximately the 10:25 timestamp of Government's Exhibit 3. At approximately the 10:41 timestamp, Bailey can be seen taking the marijuana plate as it is handed to him by an occupant of the Fusion, and Bailey setting it on the roof of the Fusion.

Once the K-9 alerted on the Fusion, officers removed the three occupants from the vehicle. [3:22:38 to 3:24:20]. Bailey explained that Bender proceeded to conduct a patdown of Defendant and attempted to place handcuffs on him. Id. A second or two later, Defendant attempted to flee. Id. Defendant's flight lasted only a few steps, as several officers tackled him. Id. Bailey testified that Defendant attempted to swallow something, although Bailey was not as familiar with that because he continued to provide security as to the remaining occupants of the Fusion. Id.

On cross-examination, Bailey explained that he was standing at the driver's door of the Fusion when Defendant reached across the driver's seat from the passenger seat to pass the marijuana plate to Bailey. [3:25:02 to 3:25:57]. Bailey could not see from where Defendant obtained the plate, nor was the plate in plain view when Bailey approached the Fusion. Id. The K-9 alerted on the vehicle when the marijuana plate still was on top of the Fusion. Id.

### D. Bender's Testimony (Direct and Cross Examination)

The Government called Bender to testify. Bender testified that he is a K-9 handler with the Clarksburg Police Department. [3:27:40 to 3:28:05]. Bender works with K-9 partner Asta, a German Shepherd. [3:28:40 to 3:28:46]. Bender testified that he was the first backup officer to arrive at the scene of Lantz's traffic stop of the Fusion. [3:31:12 to 3:32:03]. Other officers arrived quickly thereafter. Id. Bender talked first with Lantz, and learned that the reason for the traffic stop was a hand-to-hand drug transaction involving a female on a bicycle. Id. Lantz also told Bender that he smelled the odor of marijuana coming from the Fusion. Id.

Bender was wearing a bodycam during the traffic stop, and captured video footage. [3:32:06 to 3:32:40].[10] Bender ultimately retrieved Asta from his police vehicle, took her to the Fusion, and conducted a free air sniff of the exterior of the Fusion. [3:34:12 to 3:35:00]. Asta

---

[10] Bender's bodycam footage is Government's Exhibit 5.

indicated on the Fusion, meaning that she detected the presence of illegal drugs. Id. When Asta conducted the sniff, Defendant was seated in the front passenger seat. [3:35:20 to 3:35:25]. When Asta indicated on the door next to Defendant's seat, Defendant told Bender that there was marijuana on top of the Fusion. [3:35:27 to 3:35:53].

Bender returned Asta to his police vehicle. [3:36:39 to 3:36:45]. Bender then escorted Defendant out of the Fusion. Id. As Bender escorted Defendant from the Fusion, Defendant said to Bender that there was a bag of "weed stuff" in the floorboard of the vehicle. [3:37:00 to 3:41:46]. Bender searched Defendant's pockets. Id. During this search, Harris asked Defendant if there was a Crown Royal bag tied to Defendant's waistband. Id. Bender also asked Defendant about the Crown Royal bag, and Defendant replied that it was "more weed stuff." Id.

Bender tried to retrieve the Crown Royal bag, and Defendant attempted to flee. Id. Bender grabbed Defendant's shirt and tripped Defendant to the ground. Id. Defendant was not cooperative with the officers. Id. Defendant reached for something in his pants, while Lantz and Harris were helping Bender with Defendant. Id. Defendant reaching for something in his pants was concerning, because officers believed that he may have been reaching for a weapon. Id. In any case, Defendant then tried to swallow the contents of the Crown Royal bag. Id. Defendant could not swallow its contents. Id. Bender tased Defendant three times. Id. Officers discovered a white, powdery substance in the Crown Royal bag. Id.

Bender clarified that when Asta indicated on the Fusion, she did so on the front driver's door and front passenger's door. [3:44:46 to 3:44:51].

### E. Semplice's Testimony (Direct and Cross Examination)

Defendant called Semplice to testify. Semplice stated that he is an investigator with the Federal Public Defender. [3:46:29 to 3:46:37]. Semplice testified as to an investigation he

16

conducted which involved measuring, at various points, the width of the road (Philippi Pike) which the Fusion had traveled, on which Lantz observed the traffic violation at issue. [3:49:47 to 3:51:27]. Semplice had access to the above-noted videos, via discovery herein, and thus was able to visit locations depicted in them. Id. Semplice drove the same route which the Fusion traveled. Id. Observing that Philippi Pike was narrow in places, Semplice set out to measure its width in certain places. Id. Using an industrial-size measuring tape, Semplice took measurements along Philippi Pike along a distance that was between one-fourth mile and one-half mile. [3:51:41 to 3:52:55]. He took approximately 10 different measurements at various intervals. Id.

Semplice testified as to Defendant's Exhibit 2. [3:53:04 to 3:55:41]. This exhibit is a map which Semplice created using Google Earth. Id. He explained that he took measurements of the width of the lane of travel (the measurements being from the inside edge of the double yellow line on the side of the lane of travel). Id. At some points there was no white line on the outer edge, but there was a curb, so Semplice took measurements to the curb. Id. At other points, there was a white line on the outer edge, so the Semplice took measurements to the inside of the white line. Id.

Semplice paid special attention to the sharp curve in the road where the traffic violation allegedly occurred. [3:56:09 to 3:57:18]. He concentrated a number of measurements in that segment of the road. Id. The measurements of lane widths in that segment were nine feet, five inches; nine feet, eight inches; nine feet, three inches; and eight feet, 11 inches. Id. Based on Semplice's investigation, he concluded that Philippi Pike seemed to be narrower in the area of the curve. [3:57:21 to 3:57:57].

On cross-examination, the Government's counsel presented Government's Exhibit 6 to Semplice. [3:58:20 to 4:01:41]. The exhibit is a Google Street View image of the sharp curve in question, generated in September 2023, four months after Lantz observed the Fusion. Id. In

response to counsel's questioning, Semplice stated it was possible for the operator of a vehicle in the lane in question to do so without necessarily crossing the yellow lines. Id.

### F. Golden's Testimony (Direct and Cross Examination)

Defendant called Golden to testify. Golden testified that he is a Task Force Officer who was involved in the investigation of Defendant giving rise to the charges herein. [4:05:00 to 4:06:13]. Golden was utilizing a CI in the course of the investigation. Id. The CI had information about a possible drug transaction. Id. The CI contacted Golden on May 30, 2023 and told Golden that a female was with the CI at a house in Nutter Fort, West Virginia. Id. The CI told Golden that the female was going to travel to the area near Hardees in Clarksburg, West Virginia to purchase "fetty," which Golden explained is the street name for fentanyl. Id. The female was going to purchase the fentanyl from a male whose identity was unknown then. Id.

Golden said the CI had provided information to the Task Force in the past, and Golden himself had previously interviewed the CI and was familiar with the CI. [4:06:50 to 4:07:32]. As for the event in question, the CI told Golden that the female who would be traveling to Hardees was white. [4:08:33 to 4:09:15]. Golden already was in the area when he received the call, so he proceeded to try to locate the female. Id. Golden eventually saw the CI and a white female traveling together in Nutter Fort along Buckhannon Pike. [4:09:40 to 4:11:22]. Golden monitored the two people from his vehicle. Id. The CI was walking, while the white female was on a bicycle. Id. They were traveling toward Clarksburg. Id. The CI and the white female then went separate directions, and Golden continued to monitor the white female on the bicycle. Id.

Golden eventually stopped near Hardees. [4:11:28 to 4:12:08]. Golden testified that the Hardees area is a "very common meeting location for drug deals to happen." Id. During his time with the Task Force, Golden has known of "numerous" drug deals to occur there. Id. The CI had

told Golden that the drug transaction would happen at Hardees. Id. Golden parked in the CVS parking lot. Id. The CVS parking lot is positioned above the Hardees lot, affording a good vantage point of the Hardees lot. Id. By being in the CVS lot, Golden could see points of ingress and egress, as well as the CVS lot itself. Id.

Golden then noticed the Fusion parked in the CVS lot (not the Hardees lot). [4:12:10 to 4:14:18]. Golden then left the CVS lot to locate the white female on the bicycle, who was continuing to make her way to the Hardees area. Id. Golden returned to the CVS lot. Id. He had seen a white male leave the driver's seat of the Fusion and go into CVS. Id. Also, he saw a white female in the back seat of the Fusion, and a black male in the front passenger seat. Id. Golden remained in his vehicle in the CVS lot to conduct surveillance. Id. Golden did not have a dashcam or bodycam to capture video footage of what he saw. Id.

Eventually, Golden observed the female on the bicycle arrive at the CVS parking lot and approach the Fusion. [4:15:22 to 4:16:32]. Golden then observed the female conduct what appeared to be a hand-to-hand drug transaction with someone in the Fusion; after the transaction, the female went one direction and the Fusion went another, toward Philippi Pike. Id. Golden then shared his observations (including a description of the Fusion) with Lantz. Id. Knowing that Lantz was pursuing the Fusion from there, Golden then went to find the white female on the bicycle. Id.

When he observed the suspected hand-to-hand transaction, Golden was not so close as to see drugs changing hands. [4:17:19 to 4:20:07]. He also was not close enough to see money changing hands. Id. What Golden did see was hands of each person in the transaction interacting with one another. Id. Golden could not discern which person in the car the female on the bicycle was dealing with. Id. But Golden was clear that the female dealt with someone on the passenger side of the Fusion. Id. The suspected transaction lasted a short time. Id.

Defendant's counsel published Defendant's Exhibit 3. [4:24:38 to 4:32:21]. Defendant's Exhibit 3 is security video footage of the parking lot at the time Golden was parked there and observed the suspected hand-to-hand transaction. The truck in which Golden was parked and conducted surveillance is visible in the footage. Id. The truck in which Golden was positioned was a black Chevrolet Silverado. Id. Golden explained that he was pulled into a parking spot facing Hardees; as such, he conducted his surveillance of the CVS lot by looking at the rearview mirror in his vehicle. Id. Thus, Golden was facing away from the scene of the suspected transaction. Id. Golden stated that he tries to conduct surveillance without use of a mirror like this, but sometimes, the circumstances require observation of a scene using a mirror. Id. In the video footage, the Fusion can be seen parked at the top left of the screen. Id. At the outset, the Fusion is minimally visible, as a red SUV blocks the view of the Fusion. Id. The Fusion is parked near a handicapped parking area (marked with a blue pole) and near a storage cage for propane cylinders. Id. An individual can be seen standing outside of the passenger side of the Fusion, interacting with occupants of the Fusion. Id.

Defendant's counsel questioned Golden about certain portions of the video footage. From that exchange, the following list highlights scenes in the security footage and the timestamps for each as reflected in Defendant's Exhibit 3:

- At 1:00:38, Golden's black truck arrives at the CVS lot and parks facing Hardees.
- At 1:02:50, the Fusion arrives at the CVS lot and parks. At the same time, Golden backs his truck out of the parking spot and leaves the CVS lot. Golden testified that he took a mental note of the Fusion but that, at this stage, the Fusion was not suspicious. Golden testified that he left the CVS lot to, once again, locate the female on the bicycle. Indeed, he located her in the vicinity of a nearby gas station, traveling on Buckhannon Pike toward Hardees. Golden anticipated that the female on the bicycle would continue to travel toward Hardees.
- At 1:03:30, the driver of the Fusion exits the vehicle and goes into CVS.
- At 1:07:49, Golden returns to the CVS lot in his truck. He parks in the CVS lot such that he is facing the Hardees lot. Golden testified that he oriented his vehicle that way because the information he had was that the drug transaction would occur in the Hardees lot.

- At 1:09:37, a person whom, to Golden, appears to be the same person who was the female on the bicycle, approaches the Fusion from the top left of the screen. She approaches on foot.
- At 1:09:43, the female arrives at the Fusion.
- At 1:09:45, the female goes toward the rear of the Fusion.
- At 1:09:52, the female is not visible in the video and seems to be obscured by the red SUV parked nearby.
- At 1:10:25, the female still is not visible but also does not appear to have left the scene. She apparently still is somewhere near the Fusion.
- At 1:10:59, the red SUV parked beside black Fusion backs out of its parking space, and appears to leave the CVS lot. Golden remains in the same surveillance point. The female who approached the Fusion earlier still is not visible. At this point, Golden testified that he did not recall seeing the female go inside of the Fusion while he surveilled the scene.
- At 1:11:37, the driver of the Fusion returns to the vehicle.
- At 1:11:45, the driver of the Fusion gets back inside the vehicle. The female who approached the Fusion earlier still is not visible in the footage.
- At 1:13:18, the female emerges from the rear passenger side of the Fusion and walks away from the vehicle, toward the right of the screen.
- At 1:13:25, the female walks across the CVS lot and appears to be leaving the area.
- At 1:13:41, the Fusion leaves the CVS lot.
- At 1:14:00, Golden pulls his truck away from his parking spot. Golden testified that, at this time, he observed the direction in which the Fusion was travelling and communicated that information to Lantz.

[4:32:21 to 4:50:49]. Golden testified that the main difference he perceived between the security video footage and his recollection of events is that, in the video, the white female gets inside the Fusion. [4:51:02 to 4:51:16]. Golden had not recalled the female getting inside the Fusion. Id.

On cross-examination, Golden stated that it is common for those engaged in illegal drug transactions in a location such as a public parking lot to go inside of a vehicle. [4:52:26 to 4:56:00]. Moreover, he testified that the particular area of Hardees and CVS in Clarksburg is known for its drug transactions. Id. Since beginning his time on the Task Force, Golden estimated that he was aware of more than 20, but fewer than 50, drug transactions there. Id. Golden eventually caught up with the white female on the bicycle and seized 0.81 grams of fentanyl (with packaging) from

her. Id. The female on the bicycle told Golden that she had purchased fentanyl from someone in the Fusion. Id.[11]

### III. LEGAL ISSUES AND ANALYSIS

In his initial motion [ECF No. 31], Defendant argues that there was no legitimate basis for Lantz's traffic stop of the Fusion, for lack of a traffic violation. Defendant also argues that officers impermissibly extended the traffic stop of the Fusion by relying on the smell of marijuana to conduct a search of the Fusion. As to this latter point, Defendant argues that, with recent changes to federal law via the Farm Bill, commercial hemp is not an illegal "controlled substance." Commercial hemp products have proliferated, such that the smell of "marijuana" no longer should give rise to reasonable suspicion to conduct a warrantless search.

In its response [ECF No. 38] to the initial motion, the Government flatly disputes the argument that there was no traffic violation. The Government emphasizes that Lantz mentions (and the Fusion driver apologizes for) the traffic violation at the outset of the stop. And the Government argues that the stop was not extended impermissibly because (1) Bailey and Bender arrived on the scene of the stop while Lantz still was writing the warning citation, and (2) the smell of marijuana alone did not arouse suspicion, but rather, Defendant handed the marijuana plate to Bailey and Bender's K-9 partner alerted on the Fusion. But irrespective of questions about the traffic stop, the Government argues that the suspected hand-to-hand drug transaction provided reasonable suspicion to initiate the traffic stop. Finally, the Government argues that Defendant's handing marijuana to Bailey, attempted flight from the scene, and attempt to swallow fentanyl, were intervening events that obviate any bases to challenge the stop.

---

[11] To be clear, the undersigned does not factor into the analysis herein this information gleaned from Golden's subsequent stop of the female on the bicycle. This information arose after-the-fact, and as such, does not support a finding of reasonable suspicion of a drug crime. The undersigned notes it here only to offer a complete summary of the testimony.

In his supplement [ECF No. 57] to his motion, filed after the suppression hearing, Defendant stresses that the CI's tip to Golden was unreliable, insofar as Golden did not discern how the CI knew the information conveyed to Golden. Defendant also points out that Golden ended up surveilling the CVS parking lot instead of the Hardees parking lot, when the CI had said that the drug transaction would take place at Hardees. As such, Defendant argues, this underscores the CI's unreliability. Moreover, Defendant challenges the officers' conclusion that CVS and Hardees constitutes a "high crime" area. Defendant also argues that the security footage of the CVS lot does not support Golden's version of events that there was a hand-to-hand transaction. All taken together, Defendant's argument is that there was no reasonable suspicion for the traffic stop based on drug activity. Finally, relying on the dashcam footage, Defendant reiterates the argument that there was no traffic violation. Defendant argues that (1) the Fusion did not touch or cross a double yellow line on the road, (2) even if it did, the statute on which Lantz relied does not criminalize the touching or crossing of such yellow lines, and (3) even if such conduct amounts to a traffic violation, the road itself was defective.

In its response [ECF No. 60] to Defendant's supplement, the Government argues that the CI was reliable because the Task Force had a prior relationship with the CI and had received accurate information from them. As for the suspected drug transaction which Golden observed, the Government emphasizes that Golden could rightly suspect he had seen a hand-to-hand drug transaction given the totality of the circumstances and Golden's own expertise and experience. The Government would have the Court look, commonsensically, at the whole picture. As for the conclusion that the Hardees/CVS area is "high crime," the Government notes that statistics are not required for officers to conclude that the area is such. As for the traffic violation, the Government emphasizes that (1) Lantz's account of seeing a traffic violation is "plausible," such that he had

discretion to initiate the stop on that basis, and (2) crossing the yellow line is a traffic violation regardless of whether Lantz cited the correct statute which prohibits it. Finally, the Government reiterates that, during the traffic stop, Defendant handed a plate of marijuana to an officer, then attempted to flee and swallow fentanyl. Per the Government, these are intervening circumstances which render the seizure of evidence lawful.

### A. Legal Principles

The undersigned notes, as a threshold matter, the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

A warrantless arrest and search incident to such arrest are permissible where there is probable cause that crime has been, is being, or will be committed. U.S. v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004). "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "Probable cause is judged by an analysis of the totality of the circumstances . . . which are weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene." Id. (citations and quotations omitted).

As for automobile stops, it is clear that they are a "seizure" under the Fourth Amendment. U.S. v. Sowards, 690 F.3d 583, 587-588 (4th Cir. 2012); see also Delaware v. Prouse, 440 U.S. 648, 653 (1979) ("[s]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . .").

Moreover, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). It is the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). One such exception is the "automobile exception" – that is, if a vehicle is "readily mobile" and a law enforcement officer determines there is probable cause that there is contraband or evidence of a crime within it, then the officer may undertake a warrantless search. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). Another such exception is the circumstance where the search of a person is incident to an arrest of that person. "[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area within his immediate control." Davis v. United States, 564 U.S. 229, 232 (2011) (citation and quotation omitted). The policy behind this exception is to remove any weapons an arrestee may possess and to secure evidence. United States v. Davis, 997 F.3d 191, 195 (4th Cir. 2021).

It is the Government's burden, by a preponderance of the evidence, to establish the admissibility of evidence seized without a search warrant. United States v. Small, 944 F.3d 490, 502 (4th Cir. 2019).

25

Finally, a well-established principle is that of the exclusionary rule. This rule holds that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. Analysis

In the case at bar, the necessary sequential analysis is as follows. The first issue is whether Golden's observation of the suspected hand-to-hand transaction in the CVS lot gave rise to a proper stop of the Fusion. The second issue is whether Lantz properly conducted a traffic stop of the Fusion on the basis of a traffic violation. The third issue is whether the stop of the Fusion was prolonged impermissibly. The fourth and final issue is whether the attenuation doctrine applies to obviate any prior impermissible police conduct.

*1. The suspected hand-to-hand transaction gave rise to reasonable,*
*articulable suspicion of illegal drug activity, allowing for the stop of the Fusion.*

Defendant challenges the conclusion that Golden witnessed a hand-to-hand drug transaction and that there was reasonable suspicion that he observed a crime. Specifically, Defendant questions (a) the reliability of the CI with whom Golden communicated, including the fact that the location of the suspected transaction ended up being in the CVS lot instead of in the Hardees lot (b) officers' conclusion that the area of the suspected transaction was "high-crime," and (c) Golden's observation of a suspected hand-to-hand transaction, and his recollection of events contrasted to depictions in the CVS security video.

However, in view of the testimony at the suppression hearing, the undersigned **FINDS** that officers had reasonable, articulable suspicion of a drug transaction having occurred. First, all indications are that the CI was reliable. The CI had done some previous work with the Task Force.

26

Golden himself previously interviewed the CI and was familiar with them. But perhaps more to the point, the information which the CI conveyed to Golden turned out to be accurate. Specifically, the CI told Golden that a drug purchase would occur involving a white female. The CI also said that the white female was with the CI at a house in Nutter Fort and would travel to the area of Hardees in Clarksburg for the transaction. Golden already was in the area, so shortly thereafter, he saw the CI and a white female traveling together along a road in Nutter Fort, proceeding in the direction of Hardees in Clarksburg. Golden observed that the white female was on a bicycle, and continued to surveil her as she traveled the route toward Hardees. Golden positioned himself in his vehicle close to Hardees, and shortly observed the female arrive in the CVS lot, adjacent to Hardees. Thus, the information which the CI conveyed was correct. This includes the physical description of the white female, her location in Nutter Fort at the start of events, the direction of her travel, and her destination. What is more, the information provided proved to be accurate almost immediately after Golden received it, bolstering the CI's credibility. And in the first phases of his surveillance, Golden saw the CI themselves <u>with</u> the white female at the place indicated and traveling in the direction as the CI stated. In essence, then, the CI was providing firsthand, real-time information, borne out by Golden's own observations. The CI was reliable.

That the suspected transaction took place in the CVS lot instead of the Hardees lot is of little consequence. Lantz convincingly testified that, locally, when people speak of "Hardees," they often are speaking generally of the locale in which it is located, and not necessarily limiting the description to Hardees itself. Common sense is that people in a locale reference an enterprise or landscape feature to encompass not just that thing, but also the surrounding area. In referencing "Hardees," local people could well intend to refer to CVS as well, because the businesses are located directly adjacent to each other and their parking lots are situated beside each other. In fact,

in Defendant's Exhibit 3, the security footage of the CVS lot, the Hardees property next door is easily visible. Thus, the undersigned is unpersuaded by Defendant's argument on this point.

Defendant also disputes officers' characterization of the Hardees area as "high crime," citing to the lack of specific figures reflecting criminal activity, and pointing out that events here occurred in daylight hours in an open, public setting. However, as the Government rightly points out, concluding that an area is "high crime" is not something done with mathematical or statistical precision. It is not an official designation. "Although being seen in a high crime district carries no weight standing alone, 'an area's disposition toward criminal activity is an articulable fact[]' [] that may be considered along with more particularized factors to support a reasonable suspicion." United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) (quoting United States v. Moore, 817 F.2d 1105, 1107 (4th Cir.1987)).

On this question, Both Lantz and Golden explained how the area of Hardees is known for drug activity. The Task Force has conducted investigations in neighborhoods surrounding it, and Golden stated that he himself was aware of between 20 and 50 drug transactions occurring at the Hardees area. What is more, Lantz helpfully explained that the Hardees area lends itself to drug transactions. The public nature of the businesses, and the traffic they draw, help to camouflage illicit activity of a short duration, such as a drug deal. That the events herein took place in the daytime is of little significance; after all, drug transactions can and do occur in public areas in the daylight.

Lastly, Defendant challenges Golden's observations and conclusions about the suspected hand-to-hand drug transaction. Golden candidly acknowledged that he could not discern what object or material the persons involved in the transaction were handling. He could not say for certain that it was illegal drugs or money. However, as the Government rightly argues, the

observation of a suspected hand-to-hand drug transaction is but one piece of information in the totality of circumstances, especially given Golden's training and experience. "[L]aw enforcement officers . . . may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" United States v. Johnson, 599 F.3d 339, 343 (4th Cir. 2010) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). And as Lantz testified, certain indicators of a hand-to-hand transaction were present here: two persons meeting at a place (involving a parked vehicle), having a brief interaction, and the parties leaving the area in separate directions. What is more, Golden did not rely on the suspected hand-to-hand transaction alone to conclude that there had been a drug deal. The CI had shared accurate, predictive information about the white female on the bicycle prior to her approaching the Fusion.

As for the CVS security footage provided by Defendant, it is not especially persuasive. It seems to depict the white female getting inside the Fusion, which Golden had not recalled her doing. But that does not necessarily contradict Golden's observations otherwise, or his conclusions that he had witnessed illegal drug activity. In the CVS security footage, the white female is located on the side of the Fusion opposite of the camera, and there are automobiles parked between the camara and the Fusion. This is to say that the white female, when standing next to the Fusion, is fairly obscured. It is unclear what she is doing when she is next to the Fusion. This does not, standing alone, refute Golden's version of events. It is entirely conceivable that Golden observed a hand-to-hand transaction involving the female outside of the Fusion, and that the female entered the Fusion for a short time. Lantz explained that drug transactions often involve one party getting inside of a vehicle as the female did here. Thus, the female's entering the Fusion may well bolster the conclusion that a drug transaction occurred. Finally, the truck from which Golden was

surveilling is visible in the CVS security footage. Golden's truck is positioned in such a way that Golden may well have had a vantage point of the Fusion which was better than that afforded by the CVS security camera. In other words, the security footage does not contradict Golden's testimony about what he observed the female doing when she was outside of the Fusion.

As for what constitutes "reasonable suspicion," the Fourth Circuit has instructed that:

> Reasonable suspicion is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians. To support a finding of reasonable suspicion, we require the detaining officer to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.

United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (citations and quotations omitted). In sum, in the instant matter, the undersigned **FINDS** that officers had reasonable suspicion to conclude that a drug transaction occurred in the CVS parking lot. A CI, with whom Golden was familiar, provided then-current predictive information which proved to be accurate. Golden observed a person matching the CI's description arrive to the area as stated. The area is "high crime" as supported by Golden's and Lantz's descriptions and experiences. And Golden observed the person matching the CI's description engage in an interaction which had several harbingers of an illegal drug transaction. All taken together, there was reasonable, articulable suspicion of a drug crime. As such, the traffic stop of the Fusion was proper, insofar as there was reasonable suspicion that it had been part of a crime only a short while earlier.

*2. Lantz conducted a proper traffic stop on the basis of a perceived traffic violation.*

Lantz pulled over the Fusion not only for the reasonable suspicion arising from the hand-to-hand transaction, but also on the basis that it crossed the center double yellow line as he followed it on Philippi Pike.

A law enforcement officer is permitted to stop a vehicle when the officer observes a violation of a traffic law – even if the officer may be motivated to conduct the stop for a different reason. See United States v. Hassan El, 5 F.3d 439, 726, 730 (4th Cir. 1993); Whren v. United States, 517 U.S. 806, 810-813 (1996); United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

Defendant contests that the driver of the Fusion committed a traffic violation, such that a traffic stop on that basis was improper. Defendant argues that the Fusion did not cross the yellow line; that if it did, Lantz did not rely on the proper statute to conclude there was a traffic violation; and that in any case, the road was defective such that the Fusion should not have been subjected to the stop.

While Defendant's argument here is well-taken, a close review of the record does not support it. In the carefully reviewing Lantz's dashcam footage, it appears to the undersigned that the Fusion did indeed cross onto (not necessarily over) the yellow line in the Fusion's lane of travel. And certainly, the double yellow lines where this occurred were faint, but they were discernible. As to the visibility of the lines, Lantz acknowledged that they were worn by traffic repeatedly driving on them. But Lantz helpfully noted that the lines were more visible in real-time than they are on the dashcam footage, which makes sense given that the video quality of the dashcam footage of the area of the road in question is not particularly crisp.[12]

---

[12] The undersigned is not persuaded by the Government's argument that, because Cottrill, the driver of the Fusion, apologized for the traffic violation, that Defendant is foreclosed from arguing that there was no traffic violation. A review of Lantz's bodycam footage reveals that Lantz mentioned the traffic violation to

As for whether crossing onto a double yellow line is a traffic violation, it strains credulity to suggest that it is not. In West Virginia, "[t]he driver of any vehicle . . . shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with the provisions of this chapter, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this chapter." W. Va. Code § 17C-3-4(a). To this end, "'Traffic-control devices' means all signs, signals, markings, and devices not inconsistent with this chapter placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic." W. Va. Code § 17C-1-47. Under a different section of State Code, "Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway . . .". W. Va. Code § 17C-7-1.

Defendant challenges Lantz's reliance on W. Va. Code § 17C-3-4(a) and W. Va. Code § 17C-1-47 insofar as they do not specifically describe a yellow line as a traffic-control device. But as the Government points out, "a police officer's inability to identify the correct code section at the time of a stop does not undermine valid probable cause or reasonable suspicion that a driver violated a traffic law." United States v. Williams, 740 F.3d 308, 312 (4th Cir. 2014).[13] And certainly, a reasonable reading of W. Va. Code § 17C-7-1 is that an automobile must not be driven on or over a yellow line.[14]

On a related point, the undersigned notes the somewhat inconsistent caselaw surrounding traffic stops for traffic violations – whether the applicable standard for such police activity is

_____

Cottrill in the briefest of fashions. Cottrill apologized almost by rote, as if to be cooperative with a police officer, and not because he directly conceded that there had been a traffic violation.

[13] As the Government points out, Williams does not have a direct negative history, although other courts have recognized that Williams was abrogated on other grounds by Heien v. North Carolina, 574 U.S. 54 (2014). See e.g. United States v. Jones, No. 23-4559, 2024 WL 2012489, at *1 (4th Cir. May 7, 2024).

[14] The undersigned is not persuaded by Defendant's argument that other vehicles visible in Lantz's dashcam footage crossed the center yellow line. That does not render the Fusion's doing the same as being lawful.

probable cause or reasonable suspicion. To be clear though, in this case, the undersigned finds that, based on the traffic violation, Lantz had probable cause to initiate the traffic stop, and as such, also met the less-stringent reasonable suspicion threshold.

Finally, Defendant asks that the Court declare that the road, on which the Fusion was driven, was defective, obviating the basis for the traffic stop. Defendant points to the faint yellow lines in the sharp curve, resulting from traffic so commonly driving over them. Seemingly in support of this argument is the evidence which Semplice generated. That evidence shows the road to narrow at the sharp curve where the Fusion crossed onto the yellow line. However, the undersigned is unaware of authority which would allow a court to make such a determination in these circumstances. Nothing of record shows that the Fusion necessarily <u>had</u> to cross outside of its lane of travel to successfully and safely navigate the curve. A commonsense review of the dashcam footage and still photos of the curve (provided by both sides) shows that an ordinary vehicle could be driven around the curve within its lane of travel, if operated reasonably slowly and carefully.

In sum, the undersigned **FINDS** that the traffic stop on the basis of a traffic violation was lawful.

### 3. The stop of the Fusion was not impermissibly prolonged.

Defendant argues that the traffic stop was extended impermissibly, improperly affording officers more time to conduct further investigation into drug activity. However, the record does not support this conclusion.

In the context of a traffic stop, "[a]n officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether

the driver is subject to outstanding warrants." <u>United States v. Hill</u>, 852 F.3d 377, 382 (4th Cir. 2017) (quoting <u>Rodriguez v. United States</u>, 575 U.S. 348, 355 (2015)). However, "[w]hile diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers. . .Such unrelated activity is permitted under the Fourth Amendment only as long as that activity does not prolong the roadside detention for the traffic infraction. For example, an officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop." <u>Id.</u> (citations omitted).

Lantz testified about how he was going through the process to issue a warning to Cottrill, the driver of the Fusion. Part of that process is having dispatch run the name of the driver to check for outstanding arrest warrants. He also had dispatch run the vehicle's tags to see whether it was stolen or whether there were similar issues. In the instant matter, Lantz's bodycam footage plainly shows that he (1) expeditiously obtained Cottrill's information to relay to dispatch, and then so relayed it, and (2) was awaiting dispatch to respond to him about Cottrill when Bailey and Bender arrived at the scene. As to the latter, Bailey and Bender arriving, it of course culminated in (a) Defendant handing drugs to Bailey and (b) the K-9's free air sniff of the Fusion and the K-9's positive indication on that vehicle. That is to say, Lantz still was in the process of issuing the warning when other officers arrived and discovered evidence of drug activity.

Defendant focuses on Lantz's statement to another officer during the stop, heard in the bodycam footage, that he was "pretty sure" that he smelled marijuana. To Defendant, that is an equivocal statement, which shows that Lantz's perception about the presence of drugs was conjecture. However, Lantz testified about his considerable training and experience in the smell of marijuana. This includes the frequent and numerous encounters with marijuana in the course of

his work over the preceding year. It is safe to say that Lantz knows the smell of marijuana when he encounters it. Moreover, the tone in which Lantz makes that remark displays more conclusiveness about the presence of marijuana than does a transcript of it. There is no doubt that Lantz definitely concluded that he smelled marijuana. In fact, in another portion of Lantz's bodycam footage, he can be heard definitely saying to himself, when he first returned to his vehicle during the stop, that he could "smell a little bit of weed."

Defendant also argues about that the smell of hemp is indistinguishable from that of marijuana. The argument is that legalization of certain hemp products in the federal Farm Bill, and the proliferation of such products, mean that the smell of marijuana alone should no longer give rise to reasonable suspicion. However, Defendant cites no authority for this argument. And so far as the undersigned is aware, there is no change in Fourth Circuit caselaw that "we have 'repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.'" United States v. Jones, 952 F.3d 153, 158 (4th Cir. 2020) (quoting United States v. Humphries, 372 F.3d 653, 658 (4th Cir. 2004). Thus, without some further directive, the argument based on the Farm Bill fails.

However, the issue of whether Lantz smelled marijuana at the stop is of little consequence. After all, moments after Bailey approached the Fusion, Defendant handed Bailey the marijuana plate, removing any doubt about the presence of marijuana in the Fusion. Defendant handed Bailey the plate of marijuana in the usual course of Lantz writing the citation. What is more, the K-9 free air sniff also occurred while Lantz was writing the citation. To this end, a K-9's positive indication of drugs during a free air sniff gives rise to probable cause for officers to perform a warrantless search. United States v. Green, 740 F.3d 275, 282 (4th Cir. 2014).

Thus, the undersigned **FINDS** that, during the stop, officers knew of drug activity in short order and in the usual course of the issuance of the traffic warning. Therefore, the stop was not impermissibly delayed.

### 4. With Defendant's voluntary display of marijuana, attempted flight from the traffic stop, and attempt to swallow drugs, the attenuation doctrine applies.

Finally, the Government correctly argues that the attenuation doctrine applies here, once Defendant voluntarily displayed marijuana to Bailey, and attempted to flee and swallow drugs.

The attenuation doctrine operates to allow admission of evidence where there is a remote or interrupted occurrence between impermissible law enforcement action and acquisition of such evidence. A three-prong test set forth in Utah v. Strieff guides a court in application of the attenuation doctrine.

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. . . Second, we consider "the presence of intervening circumstances." . . . Third … we examine "the purpose and flagrancy of the official misconduct."

Utah v. Strieff, 579 U.S. 232, 239 (2016) (quoting Brown v. Illinois, 422 U.S. 590 (1975)). See also U.S. v. McKinnon, 92 F.3d 244, 247 (4th Cir. 1996).

In the instant matter, Defendant displayed a plate of marijuana to an officer (Bailey) on the scene of the stop, and attempted to flee once officers detained him. Plus, as officers stopped Defendant's flight and were subduing him, Defendant attempted to swallow drugs. Thus, even if officers' conduct up to that point was somehow unconstitutional (which the undersigned does not find), the attenuation doctrine legitimizes the discovery of drug evidence.

As for the Strieff factors, first, the "temporal proximity" between (a) the police conduct which Defendant challenges and (b) Defendant's intervening actions is not an overriding issue. The police conduct of which Defendant complains occurred minutes (e.g. Golden's observations

at Hardees/CVS) or moments (e.g. drug detection during traffic stop) prior to Defendant's intervening actions. The times between one and the other are brief. However, that is not the end of the inquiry.

As to the second prong of <u>Strieff</u>, the intervening circumstances (i.e. Defendant's voluntary display of marijuana to an officer, attempted flight, and attempted swallowing of drugs) are key. There was a clear, abrupt shift in circumstances at the scene. First, Defendant apparently had a plate of marijuana at the ready, insofar as he presented it to Bailey as soon as Bailey approached the Fusion. As Lantz testified, the voluntary surrender of marijuana at a traffic stop commonly is a technique to thwart officers' interest in searching the vehicle. Second, there was a rapid change at the scene: Defendant suddenly and without warning attempting to flee, resisting officers' attempts to stop the flight, reaching into his pants as if he could have a weapon, and attempting to swallow illegal drugs. This of course created a dangerous situation for officers, other occupants of the Fusion, any persons who may have been nearby, and Defendant himself. By Defendant's own conduct at the scene, there were illegal acts and evidence of drug activity. This weighs heavily in favor of applying the attenuation doctrine.

Finally, as to the third and final prong of the <u>Strieff</u> analysis, there is no issue about police misconduct. The third prong of the test exists, as a matter of policy, to deter intentional or flagrant police misconduct. <u>See</u> <u>Strieff</u>, 579 U.S., at 241. For the sake of argument, if Defendant's views about police misconduct are accurate, nothing about the initial stop of the Fusion or officers' subsequent conduct during the stop could be characterized as intentional or flagrant. After all, in trailing and stopping the Fusion, Lantz had real-time information from an experienced law enforcement colleague about having witnessed a hand-to-hand drug transaction involving the Fusion. As for the traffic violation, Lantz arguably observed it, and as such, had authority to

conduct the traffic stop. And then during the stop, in the usual course of Lantz writing a citation, Defendant himself presented marijuana to an officer, and a K-9 indicated on the Fusion. Thus, officers had every reason to be concerned about illegal drug activity. Nothing about police activity in this case was in bad faith or in contravention of constitutional norms and principles. In other words, there was no police conduct in need of deterrence.

Accordingly, the undersigned **FINDS** that, even if police conduct leading to the traffic stop was improper, the attenuation doctrine applies such that evidence recovered should not be suppressed.

### IV. CONCLUSION

Accordingly, the undersigned **FINDS** that the Government has met its burden, by a preponderance of the evidence, to show the admissibility of evidence seized without a warrant. Thus, for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [ECF No. 31] be **DENIED.**

Any party shall have fourteen (14) days from the service of this Report and Recommendation to file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the presiding United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir.

1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted July 2, 2024.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE