IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                         Crim. Action No. 1:24-CR-2
                                   (Judge Kleeh)

JO-EL TORRES,

        Defendant.

**MEMORANDUM ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION [ECF NO. 61], DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [ECF NO. 31], AND OVERRULING DEFENDANT'S OBJECTIONS [ECF NO. 62]**

Pending before the Court is *Defendant's Motion to Suppress* [ECF No. 31] and the *Report and Recommendation Recommending that Defendant's Motion to Suppress [ECF No. 31] Be Denied* [ECF No. 61]. Defendant Torres filed objections to the R&R. ECF No. 62. For the reasons discussed herein, the R&R is **ADOPTED**, the motion to suppress is **DENIED**, and the objections are **OVERRULED**.

## I.   PROCEDURAL HISTORY

The Defendant, Jo-El Torres ("Torres" or "Defendant"), was indicted on January 3, 2024 on one count of Possession with Intent to Distribute Fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and one count of Possession with Intent to Distribute Alprazolam, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(2). ECF No. 1. On April 4, 2024, Defendant filed the

subject *Defendant's Motion to Suppress* [ECF No. 31]. By Order dated April 5, 2024, the Court referred the motion to Magistrate Judge Michael J. Aloi to conduct a hearing and enter a report and recommendation as to the disposition of the motion [ECF No. 32]. The Government filed its response in opposition to the suppression motion on April 11, 2024. ECF No. 38.

Thereafter, the magistrate judge conducted a hearing on Defendant's Motion on May 16, 2024, at which time the Court heard witness testimony, accepted exhibits into evidence, and heard the argument of counsel for both Defendant and the Government. Following the hearing, Defendant filed a supplement to his Motion to Suppress on June 7, 2024 [ECF No. 57] and the Government responded in opposition to the supplement on June 14, 2024 [ECF No. 60]. On July 2, 2024, Magistrate Judge Aloi issued a Report and Recommendation ("R&R") [ECF No. 61], recommending that Defendant's Motion [ECF No. 31] be denied. The parties were given fourteen (14) days to file specific written objections to the R&R. Defendant filed objections to the R&R on July 16, 2024 [ECF No. 62].

## II.   FACTUAL BACKGROUND

On May 30, 2023, Officer Aaron Lantz of the Bridgeport, West Virginia Police Department and the Mountaineer Highway Interdiction Team conducted a traffic stop on a black Ford Fusion, driven by David Cottrill. Defendant Jo-El Torres was in

2

the passenger seat of the vehicle. The vehicle was stopped for two reasons: (1) reasonable suspicion the Ford Fusion was involved with a recently observed suspected drug transaction and (2) an observed traffic violation. The following facts were deduced from a suppression hearing before Magistrate Judge Aloi on May 16, 2024, in which four police officers and an investigator with the Federal Public Defender's Office testified. Several exhibits were introduced into evidence including dashcam video footage, bodycam video footage, and security video footage.

On May 30, 2023, a confidential informant ("CI") contacted Detective Cameron Golden of the Bridgeport, West Virginia Police Department and informed him that a white female was going to travel to the area near the Hardees in Clarksburg, West Virginia to purchase fentanyl. The CI had previously given information to the Greater Harrison County Drug and Violent Crimes Task Force ("Task Force") and Detective Golden was familiar with the CI. Additionally, the area surrounding Hardees was known to the Task Force as a common location for drug deals. Following the tip, Detective Golden located the CI and a white female traveling toward Clarksburg along Buckhannon Pike in Nutterfort, West Virginia. The white female was riding a bicycle, while the CI traveled on foot. Eventually the CI and the female parted ways

and Detective Golden followed the white female until she stopped bicycling near the Hardees.

Detective Golden then parked at the CVS near the Hardees where he could see both the Hardees and CVS parking lots. Detective Golden then observed a black Ford Fusion in the CVS parking lot. Detective Golden left the CVS parking lot to locate the white female on the bicycle and found that she was still making her way to the Hardees area. Thus, he retuned to the CVS parking lot to continue his surveillance. Detective Golden observed that the Ford Fusion's passengers included a white male in the driver's seat, a black male in the front passenger seat, and a white female in the back seat.

After some time, the female on the bicycle came to the CVS parking lot and approached the Ford Fusion. Detective Golden then testified that he observed the female conduct what appeared to be a hand-to-hand drug transaction with someone in the Ford Fusion. Detective Golden was not parked close enough to the Ford Fusion to see money or drugs change hands. Rather, he testified that he was able to see the hands of the white female interacting with the hands of someone on the passenger side of the Ford Fusion. The suspected transaction only lasted a short time. Following the suspected drug transaction, the white female on the bicycle left in one direction and the Ford Fusion went another direction, towards Philippi Pike. At such time,

4

Detective Golden shared his observations and a description of the Ford Fusion with Officer Lantz. Detective Golden then pursued the female on the bicycle while Officer Lantz pursued the Ford Fusion.

CVS surveillance footage from the parking lot was presented at the suppression hearing. Upon review of the footage, Detective Golden testified that the difference in the footage and his recollection of the events was that the white female got inside of the Ford Fusion during the interaction. He further testified that it was common for those engaged in illegal drug transactions in a public parking lot to go inside the vehicle to complete the transaction.

Upon receiving information from Detective Golden, Officer Lantz positioned his vehicle at a nearby cemetery. He testified that he was familiar with the Ford Fusion and had known it to be associated with drug distribution activity because he had previously recovered drugs from stopping the vehicle. Upon learning the direction the Ford Fusion was traveling, Officer Lantz proceeded driving in the same direction. Dashcam and bodycam footage from Officer Lantz was submitted into evidence. Officer Lantz believed he had reasonable suspicion of drug activity to justify stopping the Ford Fusion.

Once Officer Lantz began following the Ford Fusion, he also observed a traffic violation on a sharp curve in the road.

5

Specifically, the Ford Fusion purportedly traveled to the left of the double yellow lines in the center of the road. According to Officer Lantz, the double yellow lines are faint due to wear because drivers commonly operate their vehicles on the double yellow lines when navigating the curve. However, he further testified that there is a dangerous risk of a head-on collision at the curve in the road when vehicles cross the double yellow lines.

Upon observing the traffic violation, Officer Lantz initiated a traffic stop of the Ford Fusion. Officer Lantz recognized the vehicle's driver as David Cottrill. He did not know the male in the front passenger seat (Defendant Jo-El Torres) but later recognized the female in the backseat from prior drug trafficking investigations. When Officer Lantz first approached the Ford Fusion, he testified that he could smell fresh un-burned marijuana. He can later be heard on his dashcam footage noting that he could smell a bit of weed.

Officer Lantz approached the Ford Fusion, informing Cottrill that the vehicle went left of center around a turn. Officer Lantz ran the Ford Fusion's tag and Cottrill's name to determine if there were any outstanding warrants or other issues. Officer Lantz additionally needed to get updated information from Cottrill because the address on his license and

registration was outdated. Officer Lantz filled out a warning for Cottrill while waiting to hear back from dispatch.

While waiting to hear back from dispatch regarding the warrant and license check, Patrolman Kane Bender, a K-9 handler with the Clarksburg Police Department, arrived on the scene. Shortly thereafter, Sergeant Martin Bailey and Sergeant Harris also arrived. After their arrival, dispatch informed Officer Lantz that Cottrill had a valid license and no outstanding warrants. Thus, Officer Lantz then had all the necessary information to complete Cottrill's warning.

During this time, Officer Bender conducted a free air sniff of the Ford Fusion's exterior with his K-9 partner Asta. Bodycam footage from Officer Bender was submitted into evidence. Prior to the K-9 sniff, Officer Bailey asked the vehicle occupants if they had anything illegal that they wished to disclose. While the occupants did not respond, a few moments later Defendant Torres handed Officer Bailey a plate of Marijuana. Officer Bailey then placed the plate on the roof of the Ford Fusion, and Officer Bender and Asta approached the vehicle. Asta then conducted a free air sniff of the exterior of the Ford Fusion. Asta indicated on the front driver side door and the front passenger side door, meaning she detected the presence of illegal drugs.

The vehicle passengers were removed from the Ford Fusion. After returning Asta to his police vehicle, Officer Bender escorted Defendant from the Ford Fusion. The Defendant told Officer Bender there was a bag of "weed stuff" in the floorboard of the Ford Fusion. Officer Bender conducted a search of Defendant's pockets. During the search, Officer Bender asked Defendant if a Crown Royal bag was tied to his waistband and inquired as to its contents. Defendant replied that the bag contained "more weed stuff." When Officer Bender went to retrieve the Crown Royal bag, Defendant attempted to flee.

Defendant was stopped by multiple officers and taken to the ground. Defendant resisted multiple commands from the officers and was not cooperative. Officers testified that Defendant reached for something in his pants. This concerned the officers because they believed Defendant may have a weapon. Defendant then attempted to swallow the contents of the Crown Royal bag, but Officer Lantz reached into his mouth to prevent him from swallowing the contents. Officer Bender also tased Defendant three times. Ultimately, the officers determined that the Crown Royal bag contained two bags of fentanyl, one bag of cocaine, and a quantity of Alprazolam pills.

## III. **STANDARD OF REVIEW**

When reviewing a magistrate judge's R&R, the Court must review de novo only the portions to which an objection has been

8

timely made. 28 U.S.C. § 636(b)(1)(C). Otherwise, "the Court may adopt, without explanation, any of the magistrate judge's recommendations" to which there are no objections. Dellarcirprete v. Gutierrez, 479 F. Supp. 2d 600, 603-04 (N.D.W. Va. 2007) (citing Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983)). Courts will uphold portions of a recommendation to which no objection has been made unless they are clearly erroneous. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).

## IV.  DISCUSSION

Defendant objects to three of the magistrate judge's findings in the R&R. ECF No. 62. First, Defendant contends that the observed activity at the CVS did not amount to reasonable suspicion to support the vehicle stop. Id. Second, Defendant argues that a traffic violation did not occur to justify the traffic stop. Id. Third, Defendant asserts that the attenuation doctrine does not enable the introduction of the alleged unlawfully seized evidence. Id. As further elaborated upon below, the Court **OVERRULES** Defendant's objections [ECF No. 62], **ADOPTS** the R&R [ECF No. 61], and **DENIES** the motion to suppress [ECF No. 31].

### a.   Applicable Law

The Fourth Amendment to the United States Constitution provides,

> The right of the people to be secure in
> their persons, houses, papers, and effects,
> against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by
> Oath or affirmation, and particularly
> describing the place to be searched, and the
> persons or things to be seized.

The Supreme Court of the United States has further held that warrantless seizures are "per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). One such exception is the investigative stop, which is also referred to as a Terry stop. Terry v. Ohio, 392 U.S. 1 (1968). A Terry stop has been held to be constitutional when the officer's action is supported by an articulable, reasonable suspicion that the person seized had engaged in criminal activity. United States v. Sokolov, 490 U.S. 1, 7 (1989). A brief detention for investigative purposes is reasonable if an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry, 392 U.S. at 30; see also Turmon v. Jordan, 405 F.3d 202, 205 (4th Cir. 2005).

Reasonable suspicion "defies precise definition." United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008). To determine whether reasonable suspicion exists, courts consider "the 'totality of the circumstances' to determine if the officer had

10

a 'particularized and objective basis' for believing that the detained suspect might be armed and dangerous." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013), cert. denied, 134 S.Ct. 1530 (2014) (citations omitted). "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." Id. (Citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). Multiple factors may together "create a reasonable suspicion even where each factor, taken alone, would be insufficient." Id. at 300 (citing United States v. Branch, 537 F.3d 328, 339 (4th Cir. 2008)).

The Supreme Court of the United States has "counseled lower courts to give 'due weight' to the factual inferences drawn by police officers as they investigate crime." Id. (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). An officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

**b. Reasonable Suspicion of Criminal Activity Existed to Stop the Vehicle Following the Activity Observed at CVS.**

Defendant's first objection is overruled because the magistrate judge rightfully determined that the suspected drug transaction at CVS amounted to reasonable suspicion to support the vehicle stop.

11

Defendant argues that the R&R incorrectly concluded that the police officers had reasonable suspicion to believe a drug transaction occurred in the CVS parking lot. ECF No. 62 at p.3. Specifically, Defendant objects to the magistrate judge's finding that the Confidential Informant was reliable and takes issue with differences between Detective Golden's recollection of the suspected drug transaction and footage from the CVS security cameras. Id. at pp. 3-4.

Defendant contends it is significant that the CI had never previously given Detective Golden information "pertaining to an investigation happening in real time." Id. at p. 3. While Defendant concedes that the CI's tip matched the description of the person later seen in the CVS parking lot and the location identified by the CI was a known crime area, Defendant argues that there was insufficient evidence for the magistrate judge to determine whether the CI was reliable. Id. The Court disagrees.

A finding of credibility and reliability does not require a confidential informant to have previously given law enforcement the exact same type of information or require each piece of information to be entirely accurate. The CI previously gave information to the Task Force. ECF No. 61 at p. 18. Furthermore, Detective Golden was familiar with the CI and had previously interviewed them. Id. Nonetheless, there was sufficient corroboration to determine the CI's tip was reliable. Detective

12

Golden observed the CI with a woman matching the description of the CI's tip heading in the direction of the Hardees/CVS area. Id. Detective Golden then observed the same woman arrive at the CVS. Thus, sufficient evidence existed for the task force to rely upon the Confidential Informant's tip and Defendant's first objection is **OVERRULED**.

c.    **The Traffic Violation Served as an Independent Basis to Stop the Vehicle.**

Defendant's second objection is overruled because probable cause existed to support that the Ford Fusion committed a traffic violation. Importantly, a law enforcement officer is permitted to stop a vehicle when the officer observes a vehicle violating a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); See also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted). Observing a traffic violation provides sufficient justification for an officer to detain the vehicle for as long as it takes for the officer to perform a routine traffic stop. Branch, 537 F.3d at 335.

West Virginia law provides that "[t]he driver of any vehicle . . . shall obey the instructions of any official traffic-control device . . . unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this chapter." W. Va. Code § 17C-3-4(a). Chapter 17(C) of the West Virginia Code defines "traffic-control devices" as "all signs, signals, **markings**, and devices . . . placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic. W. Va. Code § 17C-1-47 (emphasis added).

Defendant argues that the black Ford Fusion did not cross the center double yellow lines. Specifically, Defendant asserts that the R&R is erroneous because Detective Golden's dashcam footage does not show, in the defense team's opinion, a traffic violation. ECF No. 62 at p. 4. Upon review of the subject footage, the Court concurs with the magistrate judge that the footage does show the Ford Fusion crossing onto the double yellow lines. Gov. Ex. 3 [ECF No. 54] at 2:55 to 3:02.

Moreover, while Defendant contends that the dashcam footage is the best evidence, it is not the only evidence which supports the probable cause finding. Officer Lantz testified under oath at the suppression hearing regarding his first-hand observation of the traffic violation. While the yellow lines appear somewhat

14

faded in the dashcam footage, Officer Lantz testified that the yellow lines were more visible in person than in the video footage. Additionally, Officer Lantz's body camera footage shows that he discussed the Ford Fusion leaving its lane going around the turn with the vehicle's driver, David Cottrill, during the traffic stop. Moreover, the traffic stop occurred shortly after the Ford Fusion crossed onto the yellow lines (less than thirty seconds), indicating that the traffic violation instigated the stop. Accordingly, the dashcam footage and Officer Lantz's first-person observations of the Ford Fusion support a finding of probable cause that a traffic violation occurred, and Defendant's second objection is **OVERRULED.**

> **d.** **The Law Enforcement Officers Acted Lawfully; Nonetheless the Attenuation Doctrine Applies.**

Because the law enforcement officers had two separate and lawful bases for stopping the Ford Fusion, the Court need not rely upon the attenuation doctrine to admit the seized evidence. Nonetheless, for completeness and to address Defendant's final objection, the attenuation doctrine would allow for the admission of the seized evidence – had the seizure been illegal – for the following reasons.

"[W]here there is sufficient attenuation between the unlawful search and the acquisition of evidence, the 'taint' of that unlawful search is purged." United States v. Gaines, 668

15

F.3d 170, 173 (4th Cir. 2012). "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." United States v. Terry, 909 F.3d 716, 721 (4th Cir. 2018) (quoting Utah v. Strieff, 579 U.S. 232, 238 (2016)).

> To determine whether the derivative evidence has been purged of the taint of the unlawful search, several factors are considered including: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.

United States v. Cottingham, 2016 WL 484280, at *4 (N.D.W. Va. Jan. 8, 2016), report and recommendation adopted, 2016 WL 498433 (N.D.W. Va. Feb. 8, 2016) (citing Brown v. Illinois, 422 U.S. 590, 603–04 (1975)) (finding the defendant's new crimes of reckless driving and fleeing from police to constitute new and distinct offenses from the original traffic stop).

Defendant argues that the attenuation doctrine should not be relied upon to admit the seized evidence because the temporal proximity factor is missing. ECF No. 63 at p. 5. "However, suppression is not necessarily warranted in the face of the lack of a significant intervening period of time. . . . This is

16

particularly the case where as here the second and third factors
weigh heavily in favor of admissibility." United States v.
Ramage, 2009 WL 10677237, at *9–10 (N.D.W. Va. July 13, 2009)
(noting that the attenuation doctrine does not require each of
the factors to be resolved in favor of the Government).
Application of the attenuation doctrine relies upon factors —
not elements. Thus, Defendant's argument that the timing factor
is determinative is unavailing.

Here, the second and third factors heavily support
admission of the seized evidence and Defendant's objection does
not contest the weight of the second and third factors. While
the Ford Fusion was stopped, Defendant voluntarily displayed and
presented a plate of marijuana to Officer Bailey – an admission
of illegal conduct. Then, Defendant attempted to flee from the
scene and attempted to swallow a bag of illegal drugs, hidden on
his person. Defendant's voluntary admission and illegal conduct
following the traffic stop certainly amount to intervening
circumstances.

The third factor regarding police misconduct – or lack
thereof – similarly favors the Government. Even if this Court
were to find that the initial traffic stop had not been based
upon reasonable suspicion or probable cause, the officers'
conduct during the traffic stop was not intentionally or
flagrantly improper. The police officers utilized multiple

methods to investigate the illegal drug activity including a confidential informant, surveillance, a K-9 unit, among other lawful tactics. Thus, there is no misconduct which needs deterred through suppression.

Accordingly, the Court agrees with the magistrate judge that the attenuation doctrine would apply if the traffic stop was unlawful, and Defendant's objection is **OVERRULED**.

### V.    CONCLUSION

For the reasons discussed herein, the R&R is **ADOPTED** [ECF No. 61], Defendant's objections to the R&R are **OVERRULED** [ECF No. 62], and the motion to suppress is **DENIED** [ECF No. 31].

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record and all appropriate agencies.

DATED: September 4, 2024

_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

18